IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| RONALD MURRAY, pro se, | |
| Plaintiff, | |
| | |
| vs. | Case No. 04-1298-JTM |
| | |
| EDWARDS COUNTY SHERIFF'S DEPARTMENT, KEN SCHMIDT, BRYANT KURTH, MARK FRAME, JULIE LONG, and KENNETH DUPREE, | |
| Defendants. | |

## MEMORANDUM AND ORDER

Pro se plaintiff Ronald Murray is currently serving a term of imprisonment for aggravated battery causing great bodily harm in El Dorado Correctional Facility.  He has brought the present consolidated claims arguing that his constitutional rights were violated in various respects during his detention in the Edwards County, Kansas jail, including the allegations that the jail was poorly ventilated, unsanitary, insect-infested, overly-illuminated, and did not provide appropriate, clean clothing; he was denied out-of-cell exercise or recreation; he was not provided adequate medical, dental or psychological care; he was denied visitation with friends during his confinement; his non-legal mail was screened or blocked; he was not provided appropriate access to an adequate law library and that he lost a civil case as a result; that the phone system prevented him from communicating with his family and friends; and that he was prohibited from practicing his chosen religion freely. This matter is before the court on competing summary judgment motions by both plaintiff Ronald Murray (Dkt. No. 190) and by consolidated defendants Julie Long, Kenneth Dupree, Edwards County Sheriff's Department, Ken Schmidt, Bryant Kurth, and Mark Frame (Dkt. No. 200).

In addition, Murray has also filed many motions to strike various pleadings of the defendants.  One motion (Dkt. No. 214) seeks to strike the defendant's response to his motion for summary judgment on the grounds that the brief is too long.  The other motions (Dkt. Nos. 201, 210,

211, 212, and 213) seek to strike most of the affidavits presented by the defendants, citing various evidentiary objections. Murray has also filed a motion for protective order and for sanctions (Dkt. No. 209), based upon the tardy production of a copy of the jail procedures manual.

The motion to strike the response is denied; the defendant's pleading is simultaneously a response to Murray's motion, and a separate argument in favor of granting summary judgment in favor of the defendants.

Murray's request to strike various portions of the affidavits is denied. First, striking an affidavit on the grounds presented is not preferred. Unfortunately, such motions are frequently filed more for their assumed dramatic effect than as a necessary measure of justice. Instead of striking an affidavit, the better approach is for the court to consider each affidavit and, to the extent it may assert a fact which is not admissible evidence, simply exclude the requested fact from the court's ultimate findings. *See Maverick Paper Co. v. Omaha Paper*, 18 F. Supp. 2d 1232, 1234-35 (D. Kan. 1998). Second, even considered directly, Murray's motions to strike are particularly without merit. In a typical motion, Murray seeks to strike large swaths of an affidavit, with nothing more than the generic statement that the referenced paragraphs are "conclusory, lack factual support and are not based on personal knowledge." If anything, it is Murray's own motions to strike which are purely conclusory and without any grounding in the facts. The court has considered each of the affidavits in question, and finds that they provide sufficient admissible evidence to support the factual findings herein.

Murray's request for protective order and for sanctions is denied. The court finds that the failure to provide the manual at an earlier time was the product of inadvertence, that the manual was immediately supplied to Murray when it was discovered, and that the plaintiff has failed to demonstrate any real prejudice from the delayed production of the manual on June 14, 2006. Trial is not imminent. The court finds no basis for the relief sought under the facts of the case.

This result is equally true with respect to Murray's motion for sanctions against defendant Mark Frame. Murray seeks sanctions against Frame disagreeing with various portions of Frame's

affidavit.  The court has reviewed each allegation in detail and finds that plaintiff has failed to demonstrate any basis for imposing sanctions.

**Findings of Fact**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.  *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually

unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

D.Kan. R. 56 requires that a motion for summary judgment provide specific citations to admissible evidence in support of requested factual findings.  Many of the plaintiff's requested factual findings do not include such citations or such evidence, and accordingly form no part of the court's findings.  Conversely, many of Murray's attempts to controvert the facts presented by the defendants fail to comply with the rules, with the plaintiff failing to cite admissible evidence in the record to controvert the requested fact.  These facts are deemed admitted.

Although plaintiff appears pro se, he is an experienced prison litigator.  As noted earlier, Murray is currently a prisoner at the El Dorado Correctional Facility, serving a 71-month sentence for aggravated battery, a level 4 felony. He has previously had juvenile burglary and theft charges and has served prison time for burglary and theft as an adult, serving a seven-year sentence in Arizona.  He filed unsuccessful lawsuits against the Arizona prison system alleging constitutional violations.

Murray is a white supremacist, also known as a national socialist, or skinhead. He believes that homosexuals, minorities, the government and the media are destroying his culture and society.

Murray was arrested in Kinsley, Kansas after a bar fight. He was represented in that case by Charles Pike, about whose representation he has no complaints.

Murray was detained as a pre-trial detainee in the Edwards County Jail in Kinsley, Kansas from July 1, 2003 to May 11, 2004.

Edwards County is one of the smallest counties in Kansas.  There are four communities in Edwards County and two school districts. Kinsley, with a population of approximately 1500, is the county seat. The jail and sheriff's offices are located on the third floor of the Edwards County Courthouse.  The courthouse was built in 1928 and sits in the middle of a residential neighborhood. There is a daycare facility quite near the courthouse and the Kinsley school is a few blocks away.

Bryant Kurth is the duly elected Sheriff of Edwards County, Kansas.  Kenneth Schmidt is the Undersheriff.  Julie Greiner is a dispatcher supervisor.  Most of her duties relate to her dispatch position, but she also meets potential visitors for inmates and serves as matron when the jail has female inmates. Preston Duncan is a deputy.

Kenneth Dupree serves as a commissioner on the Edwards County Board of County Commissioners. Sheriff Kurth provides a proposed budget for his department, which includes operation of the jail, to the County Commission each year, which governmental entity approves or disapproves of the budget. The County Commission, and individual commissioners, have no control or responsibility for the jail. The sheriff submits an annual budget for the jail, which the County Commission can approve, or not approve.

Mark Frame is the Edwards County Attorney.  Murray has advanced a claim against him in his individual capacity, alleging that Frame told Schmidt to deny him communication outside the jail.

Sheriff Bryant Kurth is the policy-maker for the Edwards County Sheriff's Department and the Edwards County Jail.  Edwards County provides funds to the sheriff's department for the operation of the jail. The sheriff has control and responsibility of the jail.

The Edwards County Jail consists of four cells:  one large cell and three smaller cells. Two of the smaller cells are combined with an area containing a shower and toilet to make one larger cell, so basically there are three cells, two of which have two beds, and the largest of which can have up to eight beds. Most of the inmates stay in the largest cell, which is approximately 292 square feet in size and has a shower, sink, toilet, cable television and beds for up to eight inmates, although there are rarely, if ever, that many inmates housed in the jail. The two smaller cells, each with a bunk, are approximately 49 square feet each, and when combined with the other area, which the sheriff calls a day room, and the room containing the toilet and shower, the combined size is about 283 square feet. When inmates are kept in this area, Sheriff Kurth allows them the use of the entire 283 square feet. The fourth cell, often used for female inmates or inmates that are segregated from

5

the other inmates for security reasons, is about 200 square feet and also contains a shower, sink and toilet.  The total square footage of the jail is thus approximately 775 square feet.

Each cell has windows on the outside of the bars that have views to areas outside the courthouse. Inmates are allowed to open and close these windows to allow fresh air and sunshine into the cells, if they desire. The length of stay of inmates depends on several factors, including the crime charged and the ability to pay a bond.

A stay as long as Murray's stay of ten to eleven months is extremely rare.  The inmates who stay more than a few months in the jail have been charged with serious crimes such as child molestation or murder (Murray's charge was attempted murder) and have high bonds. Such lengths of stay are exceptionally rare and there have only been a few during the last nine years.  From January 1, 2003, to the present,  the average stay was 20 days.  The average number of inmates varies from zero to seven or eight, but the average number of inmates per day is about 4.5.

The sheriff's office staff includes the sheriff, undersheriff, two deputies, and four dispatchers. The jail has no jailers and the Sheriff's Department budget does not allow it to hire jailers.  So few individuals are held in the jail that it would be fiscally impossible to hire a jailer.

Sheriffs and deputies must graduate from the Kansas Law Enforcement Training Center (KLETC) and have at least forty hours of continuing training. The sheriff, undersheriff and deputies of Edwards County comply with such training requirements. Edwards County provides training for jail employees concerning the rights of detainees. Undersheriff Schmidt graduated from high school, studied criminal justice in college, graduated from the KLETC in 1988, and receives at least forty hours of continuing training per year.

There are written rules and regulations governing the operation of the jail and conduct of jail personnel. Sheriff's office personnel also receive annual training, some of which relates to the rights of inmates.  Upon his entry to the jail, Schmidt gave Murray a copy of the jail rules.

Murray alleges that the jail is not air conditioned, and that  fans were not used in the jail and the temperature became very hot.  He alleges that in the winter the cells were insufficiently heated.

6

He states that in the winter the inmates were not given extra blankets or thermal clothing. In fact, the jail uses the same heating and air-conditioning system as the rest of the courthouse. There is one air vent in each cell area. In addition, fans are used in the jail if needed and there are windows in each jail cell, outside the bars, that open to the outside and can be operated by inmates. Extra blankets are available. There is no evidence that any otherwise healthy inmate of the jail has ever suffered adverse health effects from the temperature of the jail.

Murray states that the cells were "continually filthy" and had many insects, and that the showers were not clean. However, the jail dispensed cleaning materials for the prisoners to use in their cells once a week. Additional cleaning materials would be provided if an inmate asked. Inmates were permitted to keep small bottles of disinfectant in the cells for daily cleaning. The jail, like the rest of the courthouse, was treated for insect control once a month. Murray never complained about any insect problem while he was an inmate of the jail. Inmates were permitted to clean the shower and were given access to cleaning materials to do so.

Murray states that there were no cleaning supplies for the meal area. However, detainees and prisoners at the jail are allowed to clean their meal area before and after meals. Cleaning supplies are supplied for purposes of cleaning once a week and when requested and are sometimes kept in the cell. Murray admitted in his deposition that he was free to clean his area before and after meals.

Murray complains that blankets were insufficiently cleaned, and that the prisoners were not permitted access to a laundry for their clothes. The facts establish that blankets were washed once per week, along with all fabric items distributed to prisoners. While there was no washing machine or dryer at the Edwards County Jail, all fabric items provided to prisoners (bedding, pillowcases, jump suits, shorts or tee shirts) are laundered once a week. The jailers pick up the dirty items and immediately provide the inmates clean items, so no prisoner is ever without a jumpsuit, or shorts and a tee shirt. Prisoners were also allowed to wash their own undergarments by hand in the sink or shower, and were given soap or bleach.

7

Murray has complained that lights in the area of the cells were always on.  However, the cells are monitored by close-captioned cameras twenty-four hours a day. This is necessary for prisoner safety, and is standard practice in a facility of this type. In order for the cameras to monitor the cells at night, small lights remain illuminated in the halls. There are larger, overhead lights in the cells that are turned off at night.  The defendants never heard Murray complain that the light was causing him any inability to sleep.

Murray states that he was not permitted any out-of-cell exercise during his stay at the jail or given access to exercise equipment and that as a result he lost 25 pounds from the 225 pounds he weighed when he first came to the jail.  However, as noted earlier, Edwards County is a smaller county with comparatively fewer resources, and the jail has no outside exercise area.  Murray was allowed outside his cell for visitation, visits with his attorney, cleaning of cells, and meetings with the sheriff to address grievances.  The cells were large enough for a wide variety of exercises and had windows which could be opened by the occupants to admit fresh air.  Murray did push ups, sit ups, pull ups, jogged in place, and walked in his cell.  He also fashioned weight lifting devices using a broom handle and law books.  Further, jail records show that at Murray suffered no significant weight loss.  At the time he was first booked into the jail, Murray himself indicated that he was 5'9" tall and weighed 200 pounds.  When he left the jail in 2004, he weighed the same amount.  Murray acknowledged in his deposition that he did not suffer any physical impairment such as muscle atrophy or bone deformation while at the jail, and did not develop any medical condition related to his lack of outdoor exercise.

Due to the age of the jail and its location in a residential neighborhood, it is not safe to allow prisoners out of the building for any length of time to engage in exercise. It would be a significant safety risk to construct a fenced area on the courthouse grounds to house an exercise area, given the residential neighborhood and proximity to day care facilities and schools. Some of the inmates in the jail have been charged with serious crimes, including several for murder and some for crimes against children.

8

Further, it would be extraordinarily expensive to build a brick or solid fenced area to allow inmates to exercise. This would require significant renovations to the courthouse, both inside and out, including digging foundations, pouring footings, creating a passageway from the courthouse to the facility, and moving existing piping and/or parking areas, plus the costs to actually build the wall. Moreover, even if such an area could be constructed, the department does not have sufficient staff, and cannot afford staff, to accompany detainees to the area, which would be essential to the safety of the detainees and the public. Because the county never knows how many prisoners will be housed in the facility from day to day, staffing issues, proximity to neighborhoods and preschools, and funding issues it would be virtually impossible to manage a safe and secure outside exercise area.

Murray was aware of the jail's grievance procedure, and filed numerous written grievances during his incarceration. On July 13, 2003, Murray complained about a "Mexican" inmate who was causing friction and problems. He asked that the inmate be moved before he "exploded" and had a confrontation with the "disrespectful Mexican." [Def. Exh. E.] Each time Murray complained about problems with another prisoner, the sheriff separated the two and placed them in different cells.

Murray complains that he was not visited by a physician during his stay, states that there is no procedure in the jail for the treatment of persons suffering from substance abuse, that no medical supplies are available to prisoners, and there are no procedures in place for inmates to notify the staff of the jail that they are sick. He states that the lack of out-of-cell activities was depressing and that after seven months he was "about to snap," but was not given any psychological evaluation. He states that he had headaches and a loss of sleep.

Murray was not seen by a doctor when he arrived at the jail because he was medically screened and denied any medical problems. Any inmate suffering from such symptoms of substance abuse withdrawal receives medical care. Inmates often request and are provided medical care. The jail does have some medical equipment and supplies and, indeed gave some over-the-counter medication to Murray when he requested it.

While the jail has no separate medical examining room, medical professionals sometimes visit the jail and inmates are often sent to the doctor or Edwards County Hospital for treatment. There is a separate form for inmates desiring medical attention to fill out. No incarcerated individual has ever been denied medical treatment when needed. The jail's policy is to provide appropriate medical care to inmates when necessary and in a manner that will not endanger the health or safety of other inmates or pose a safety issue to jail personnel.

Murray himself was not examined by a physician or other medically trained personnel during his stay at the Edwards County Jail because he had no medical reason to see a physician and refused opportunities to do so. Murray states that he was not permitted to see a doctor when he had flu symptoms. According to the sheriff, Murray asked for either an over-the-counter medication or to see a physician to treat his flu-like symptoms. When the sheriff asked him which he would prefer, Murray chose the medicine. The over-the-counter medication successfully treated plaintiff's symptoms. There is no evidence that Murray ever suffered from any serious medical condition while housed at the Edwards County Jail, or was injured by being refused medical treatment for any condition.

Murray also complains that he had two teeth which cracked while at the jail, but was not permitted to see a dentist. He pulled out part of the cracked tooth himself. However, Murray never asked the Edwards County Jail staff to see a dentist. On numerous occasions, he told them that he did not need medical care. Ultimately one of the cracked teeth Murray cites was removed by a dentist in October, 2004, some five months after he had been transferred to the Kansas Department of Corrections.

Murray has complained of a lack of visits permitted to inmates, and that he was not allowed to see his local friends. Murray, who has no family in Kansas, had one non-attorney visit during his stay at the jail. The jail rules allow for visits by attorneys, family, or clergy. After Murray complained that this prohibited him from seeing his then-fiancee, the rule was modified to allow her to visit. However, after the rule was changed, Murray's fiancee decided on her own to terminate her

10

relationship with him and not to visit him.  Murray's friends brought to the jail various items like clothing and coffee, but never asked to visit him and Murray never requested that he be allowed to see them.

At some point Murray wrote to Schmidt to ask why he could not have visitors like other inmates.  Murray alleges, without personal knowledge, that Schmidt then spoke with County Attorney Frame who told him no visitation should be permitted.  In fact, Frame told Sheriff Kurth that it was his visitation policy and he should enforce it as he saw fit.  Frame was never asked about visitation privileges for Murray specifically, and never told anyone to deny Murray or anyone else visitation.

On one occasion, Murray's sister Misty Roybal visited him in the jail.  No other family member attempted to visit Murray.  Murray states that his sister told him the jail staff was rude and acted like they didn't want her to visit.  He states that the visiting hours (2:00 p.m. to 4:00 p.m. on Wednesdays) are inconvenient for visitors.  The defendants deny they were rude to Roybal.

According to Murray, his non-legal mail was screened, read, and censored.  Defendants agree they screened his mail, but state that no censorship ever occurred.  The jail policies provide: "All mail, incoming and outgoing, is subject to search and censorship."  Under the jail's policies, the staff would check all outgoing and incoming non-legal mail to determine if there was any contraband and scan letters to determine if there was any threatening or other information that might impact safety at the jail facility. None of Murray's mail was edited or excised in any way. He sent or received more than 2002 pieces of mail, none of which was returned to the sender.

In one instance Murray's mail was not immediately passed along.  In this instance, Schmidt was checking the mail when he saw references to "homosexuals and niggers" in a December 3, 2003 letter from Murray to his fiancee. Knowing that Murray was accused of severely beating a homosexual man, Schmidt was concerned about a potential safety threat, and took the letter to County Attorney Frame.  Frame forwarded the letter to Murray's attorney.  Murray's attorney informed him that the letter had been copied and given to him and to Frame.

11

Following his conviction for aggravated battery, Murray wrote thirteen letters. According to Sheriff Kurth, these letters were being sent to the judge and the jury in the criminal trial. Kurth delivered the letters to the judge. The letters were later given to Murray's attorney, who then mailed them.

On December 30, 2003, Mr. Murray lodged complaints about his "conditions of confinement" which included his claim that he was suffering from a "complete ban on all communications from me including phone calls, visitation and mail," a lack of outdoor exercise, being treated differently from other detainees in regard to visitation and receipt of items from the outside, and that another prisoner, Hugh Bartlett, be moved from his cell because if he was not moved he might wind up "with extensive injuries and in the hospital" because Mr. Murray did not like him and was tired of him.

On January 21, 2004, Murray complained that the jail staff had refused delivery to of a package mailed by a friend containing some coffee, a money order, some tattoo magazines and *My Awakening* by David Duke. Murray's friend told him the package was returned unopened. The defendants deny that they returned the package.

Murray states that he was not given access to the law library, and that jail staff obstructed his attempts to represent himself. The uncontroverted facts establish that detainees are not allowed to directly enter the law library for safety reasons, but that staff delivers the materials to the detainees, and that many materials were in fact delivered specifically to Murray on a weekly basis. During the course of his stay at the jail, Kurth delivered hundreds of law books to Murray. Murray had access to a court-appointed lawyer to assist him in the defense of the criminal charge against him.    While at Edwards County, Murray asked for a paralegal to help in filing various civil claims. This request was denied.

After Murray was transferred from Edwards County, he instituted a lawsuit against the Kinsley police. This case was dismissed on February 23, 2004.

There is a telephone in each cell at the jail and inmates are allowed to freely use the phone so long as they have credit on a phone calling card, or if the recipient of the call will accept a collect call. Murray frequently used the telephone. Sometimes the telephones in the jail cells did not work, and Murray sometimes could not reach his court-appointed attorney. However, the telephones are not controlled by the sheriff's office. Murray does not give a number to the instances in which he could not reach his counsel by telephone. As noted earlier, Murray has independently stated there was nothing deficient in his attorney's representation of him in the criminal prosecution.

Murray professes the Asatru religion, a belief of Scandinavian origin. He states that he has been a sincere practitioner of the religion since 1994. The defendants do not concede that Murray's profession is sincere. No one at the jail ever saw Murray participating in any religious ceremony. Further, Murray's personal beliefs regarding minorities and homosexuals are at variance with the teaching of that religion. Murray acknowledged in his deposition that the faith does not tolerate discrimination.

The jail's policies permit the inmates to have religious books and materials, as well as to receive visits from clergy. Murray contends that the jail staff prevented him from receiving or using the candles, sage-sticks, and runes which are used in the Asatru faith.

While it is true that Murray asked his ex-fiancee, Anna Marie Fulls, to bring him Asatru literature, it is controverted that he asked her to bring him ritual tools — Murray himself testified in his deposition that those tools were at his house and are now in storage. He did not ask anyone to bring him those. According to the ex-fiancee, if Murray had asked her to bring any materials to him so that he could engage in a religious ceremony, she refused or would have refused this request. Murray did not request candles, incense or sage for any ritual while at the jail. According to Murray's deposition testimony, he asked that a friend store his ritual items or that his fiancee bring them to him, which request, as noted, she apparently denied.

Murray has complained that other inmates frequently had visitors; he has no knowledge of whom they visited with or if the visitors met the jail's policies. He also notes that one prisoner was allowed to have outside food, others see a doctor and some were given Bibles by local clergy.

## Conclusions of Law

The court will deny plaintiff's summary judgment motion.   The court grants defendants' motion for summary judgment.  To state a claim under 42 U.S.C. § 1983, the plaintiff must allege that he suffered the deprivation of a right secured by the constitution or laws of the United States and that the defendant, acting under color of state law, caused the deprivation. *See West v. Atkins*, 487 U.S. 42, 48 (1988). As a pre-trial detainee, Murray's rights are technically governed by the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment.  *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) (*citing Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)), but the fundamental analysis is the same. *Id.* (*citing Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996)). If the defendant is a municipality, the plaintiff must show that a municipal policy or custom was the moving force behind the constitutional deprivation. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).

The plaintiff must show both a concrete, identifiable injury to his own Constitutional rights, and that the injury was the product of a prison regulation which was not "reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  A regulation is valid in this context based upon an assessment of whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; whether there are alternative means that remain open to prison inmates for exercising their rights, the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.

14

In addition to these requirements for demonstrating a constitutional injury, Congress has restricted the ability of prison inmates to litigate claims for mental distress in the absence of accompanying physical injury in the Prison Litigation Reform Act (PLRA). 42 U.S.C. § 1997e(h) (2006). *See Norton v. City of Marietta*, 432 F. 3d 1145, 1150 (10th Cir. 2005).

The court finds defendants are entitled to summary judgment with respect to plaintiff's § 1983 claims under the PLRA as Murray has failed to make any claim of injury other than general claims of mental and emotional distress here. First, Murray's only claim of supposed physical injury — a loss of weight — is contrary to the uncontroverted facts, which demonstrate that he weighed the same at his admission to the jail as he did at the time he was transferred from it. Second, even if some weight loss were shown, the plaintiff has failed to demonstrate how this weight-loss is connected to the alleged unconstitutional deprivation. That is, Murray is not alleging that he was not fed while at the jail, but that he was not allowed to exercise out of his cell. Even beyond the uncontroverted facts showing that Murray could and did exercise in his cell, it is not clear how a lack of exercise would have caused weight loss to the plaintiff. Third, weight loss in itself has been deemed to be insufficient to demonstrate physical injury under the PLRA. *Davis v. District of Columbia*, 158 F.3d 1342, 1394 (D.C.Cir. 1998); *Plasencia v. California*, 29 F. Supp. 2d 1145, 1151 (C.D. Cal. 1998). Murray does not even attempt to assert any physical injury with respect to his claims regarding the conditions of confinement, medical care, visitation, mail, and First Amendment rights. As a result, Murray cannot obtain compensatory damages for these claims under the PLRA.

Even beyond the failure to meet the PLRA's requirement for physical injury, the plaintiff's various claims are individually without merit from a constitutional standpoint. The plaintiff has failed to demonstrate that he was subjected to cruel and unusual punishment in the absence of any evidence of an objectively serious absence of humane conditions of confinement, or that these conditions were the product of malicious or sadistic conduct by the jail's administrators. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *DeSpain v. Uphoff*, 264 F.3d 965, 973-74 (10th Cir. 2001).

Plaintiff's condition of confinement claim asserts inadequate temperature-control and ventilation, as well as the presence of insects and a lack of cleaning.  However, the uncontroverted facts establish that the jail cells were heated and cooled by air conditioning on the same ventilation system as the rest of the courthouse.  In addition, the detainees during the summer could open windows in the cells if they wished and were given fans to use.  During the winter, they were allowed additional blankets.  The jail, like the rest of the courthouse, was treated for insects on a monthly basis.  Cleaning materials were provided to the detainees to use in the cells.  The plaintiff's allegations as to the conditions of confinement do not rise to the level of a denial of the minimal civilized measures of life's necessities which would support such a claim.  *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1188 (10th Cir. 2003).

The plaintiff's claim that his constitutional rights were violated by the lack of outdoor exercise lacks merit under the uncontroverted facts.  Certainly regular exercise is an important requirement for the psychological and physical well-being of prisoners.  *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987).   The actual level of exercise which must be provided, however, varies based upon the circumstances of each case, *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994) ("what constitutes adequate exercise will depend on the circumstances of each case, including the physical characteristics of the cell and jail and the average length of stay of the inmates").  Here, the court finds persuasive the conclusions of Judge Saffels in a similar case, *Smith v. Harvey County*, 889 F.Supp. 426 (D. Kan. 1995), which also involved a challenge to the exercise facilities in a small Kansas county jail.  The court stated:

> The Harvey County Jail is not equipped with an outdoor exercise area, and the only area for physical exercise apparently is in the housing area. Inmates have access to printed instructions for calisthenics, and the jail makes some recreational materials, such as board games and television, available to its inmates. The average stay of an inmate in the facility is seven days, and it does not appear the jail was crowded during plaintiff's incarceration there. Plaintiff exercised in his cell during at least part of his stay in the Harvey County Jail. Under these circumstances, the court is persuaded plaintiff was not subjected to unconstitutional conditions of confinement, as he had an opportunity and sufficient space to perform at least a limited range of physical exercise during his pretrial detention. Although fresh air and outdoor recreation are universally recognized as desirable for inmates, the court finds the

conditions of plaintiff's confinement, viewed in light of the relatively short period of his detention, did not violate the Constitution.

889 F.Supp. at 431.  Murray's stay at Edwards County was longer than the plaintiff's in *Smith v. Harvey County Jail*, but this is somewhat ameliorated by the particularly large area of the cells in the Edwards County Jail.  Further, the facts establish that Murray actually did a wide variety of exercises during his stay at the jail, and Murray has failed to demonstrate the existence of any physical deterioration due to failure to obtain outdoor exercise.  The court finds under the facts of the case that the plaintiff has not demonstrated any constitutional violation.

Murray's medical care claim is similarly deficient.  Murray suffered from no serious medical condition during his stay at the jail.  In the single instance in which he suffered from minor flu symptoms, he was successfully treated with over-the-counter medication.  The plaintiff has failed to demonstrate that the defendants were deliberately indifferent to any obvious medical need.  *See Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002).

Murray argues that his constitutional rights were violated by the jail's visitation policies.  The court finds the argument without merit.  There is no right to unfettered visitation for persons held in detention.  *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 461 (1989).  Restrictive visitation procedures and determinations are clearly within the scope of prison security, and as such are subject to the broad discretion of prison officials. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Here, the plaintiff has failed to demonstrate that the jail's policy prohibiting "friends" from visiting was a violation of his constitutional rights.  Murray had free access to visits by family clergy and counsel to the extent that they wished to visit him.  Murray had free use of a telephone in his cell to speak with his friends.  He sent and received over two hundred letters while at the jail. The court finds in light of the uncontroverted evidence that the plaintiff has failed to demonstrate any constitutional deprivation from the jail's visitation policies.

This result is equally appropriate with respect to Murray's claims of interference with his mail and his First Amendment rights.  The regulation of detainee correspondence is appropriate if it advances and is reasonably related to a legitimate governmental interest, such as security, order,

17

or rehabilitation. *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Here, Murray claims that his mail was screened, that one package sent to him by a friend was returned to its sender, and in two instances his out-going mail was intercepted.  In each of the latter two instances, following not unreasonable concerns about public safety, the mail was forwarded to Murray's attorney and then allowed to proceed on its way.  The package from a friend was incorrectly addressed.  There is no evidence that the defendants deliberately interfered with Murray's mail.  In fact, to the contrary, the evidence establishes that Murray conducted an extensive correspondence while housed at the jail.  The action by the jail staff of reviewing detainee mail is not a violation of the plaintiff's constitutional rights.

Murray's claim that he was deprived of access to the courts and competent counsel is also without merit.  Detainees enjoy the constitutional right of access to the courts, which includes the right to have prison staff help inmates in filing legal papers and utilizing law libraries. *Bounds v. Smith*, 430 U.S. 817, 821-22 (1977). But the plaintiff has failed to show that this right was violated here.  Murray has demonstrated at most that he was not permitted direct, physical access to the law library, was not separately assigned a paralegal to assist him, and on a few instances he was unable to call his attorney.  The court finds that these claims do not rise to the level of a constitutional deprivation.  Murray was given frequent and heavy access to the materials of the law library, if not physical access to the library itself.  The defendants' policies restricting physical access to the library were not unreasonable in light of the limited resources of the county and the serious nature of the charges against the plaintiff.  Murray himself is an able and experienced prison litigator.  He alone decided not to file  civil actions while at the jail, concluding that they were ready for filing only some time after he had been transferred out of the jail. While he may in some instances have been unable to speak with his counsel, he nevertheless did so on many more occasions, and ultimately stated in his deposition that he was satisfied with his counsel's representation of him in the criminal action.

The court further finds that the defendants did not interfere with Murray's constitutional rights with respect to his Asatru religion.  The uncontroverted evidence fails to show any

18

deprivation.  No one ever saw Murray practice his religion in the jail.  His claim is restricted to complaining that the jail prevented his fiancee from bringing certain materials used in the religion to the jail.  But the evidence establishes that none of the defendants interfered with his religion. Murray's fiancee has stated that if Murray had asked her to bring those materials to the jail, she would have refused.

In addition, the court finds that the individual defendants are entitled to qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).  The courts apply a two-step analysis to determine if qualified immunity is appropriate:  the court must " determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998) (*citing County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998)).

Applying this standard here, it is apparent that qualified immunity applies since Murray has not demonstrated any constitutional deprivation.  Even if such a deprivation were to be found, immunity would nevertheless apply since the plaintiff has failed to show that such deprivations were a violation of clearly established precedent.  That is, as to each of his various constitutional claims, Murray has failed to demonstrate that the "contours of the right" were clear enough that "a reasonable official would understand that what he is doing violates that right."  Murray fails to make any showing that the defendants would have known that their actions in this case violated any clearly established rights of the plaintiff.

The defendants provided Murray with medical attention when requested, gave him all the legal materials he asked for, provided a cell with windows which could be opened and which permitted on average about 200 square feet of space per inmate and which was cleaned weekly.

Murray had virtually unlimited telephone access and was allowed visits from counsel and from any clergy or family who wished to visit him. Defendants screened Murray's mail only for the purpose of preventing the transfer of contraband and to promote public safety. Murray suffered no physical injury at the jail, engaged in heavy correspondence, and ultimately concluded that his defense counsel adequately represented him as to the criminal charge against him. Under the circumstances of the case, the court finds that the individual defendants are protected by qualified immunity.

IT IS ACCORDINGLY ORDERED this 26th day of September, 2006, that the plaintiff's Motion for Summary Judgment (Dkt. No. 190), Motions to Strike, Motion for Protective Order and for Sanctions, and for an Order of Contempt (Dkt. Nos. 208, 209, 210, 211, 212, 213, 214 and 237) are denied. Defendants' Motion for Summary Judgment (Dkt. No. 200) and Motion for an Extension (Dkt. No. 219) are granted. Plaintiff's Motion for Copies (Dkt. No. 222) is denied as moot. Plaintiff's Motion for Permission (Dkt. No. 217) is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE